IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

          Respondent,                   No. CR S-96-0190 DFL GGH P

   vs.

JAMES ROY BARRON,                FINDINGS AND RECOMMENDATIONS

          Movant.

_____/

Introduction and Summary

       The evidentiary hearing involved two related issues: that movant, James Barron, should have been advised by his lawyer of his right to act contrary to his lawyer's advice that he not testify, and that counsel therefore had a conflict of interest because James Barron desired to testify and his lawyer did not so desire.  Laboring mightily, but ultimately in vain, to demonstrate James Barron's lack of mental acuity (but not the fact of incompetency), counsel for Barron misses the point about effective assistance of counsel – it is  the quality of substantive advice that counts, not whether counsel has related a complete primer on constitutional rights in such a manner that even a "slow" client can understand them.  If counsel had good reason to advise the client not to testify, counsel is not ineffective because he also did not advise his client that good advice can be ignored.   In any event, James Barron has failed to show that he was legally

1

1 | prejudiced by his failure to testify.

2 |       Finding that movant's two evidentiary hearing claims lack merit, and having

3 | found previously that the remainder of movant's claims lack merit, the undersigned recommends

4 | that the petition be denied.

5 | Background

6 |       An evidentiary hearing was held on February 27, 2006, through March 1, 2006, re:

7 | movant's Claims 1 and 2 (ineffective assistance of counsel and conflicted counsel).  This court

8 | has previously recommended denial of the § 2255 second amended motion as to Claims 3, 4, 5,

9 | and 6, finding those claims to be procedurally barred, including a recommendation of denial of

10 | movant's straight allegation that he was denied his right to testify, a claim that may not be

11 | conflated with the IAC claim at issue here.  See Findings and Recommendations, filed on

12 | December 1, 2004.  In that same filing, the court ordered an evidentiary hearing as to Claims 1

13 | and 2.   In a stipulation and order filed on December 17, 2004, the court directed that the

14 | Findings and Recommendations recommending denial of all but Claims 1 and 2, would not be

15 | submitted to the district judge until there had been a resolution as to Claims 1 and 2, after which

16 | the parties could file their objections to this court's Findings and Recommendations as to all of

17 | the claims of the motion.

18 |       In addition to the testimony and arguments presented during the three days of the

19 | evidentiary hearing, the court has considered respondent's January 10, 2006, pre-hearing brief

20 | (originally in the form of a reconsideration motion, denied by order, filed on February 22, 2006);

21 | movant's counsel's (corrected) post-hearing brief, filed on June 1, 2006; and respondent's

22 | supplemental reply, filed on July 6, 2006.

23 | Facts

24 |       The underlying facts of this case have been previously set forth and are replicated

25 | herein.  See Order & Findings and Recommendations, filed on 12/1/04, pp. 2-3.  Movant, James

26 | Barron, was indicted along with his brother Troy Barron, and later Latrina Williams, on cocaine

1   trafficking charges.  The jury convicted defendants on multiple counts on October 15, 1997;

2   movant (hereafter "James B" ) was sentenced to life imprisonment on February 8, 1998.  James B

3   filed an appeal; however, the Ninth Circuit affirmed all aspects of the conviction and sentence on

4   May 26, 1999.[1]

5          James B filed his first 28 U.S.C. § 2255 motion on May 30, 2000.[2]  The issues

6   raised were: (1) ineffective assistance of counsel (waiver of James B's right to testify), (2)

7   conflict of counsel (based on the same lack of testimony).  This motion was quickly followed by

8   an amended motion filed on August 28, 2000, raising the initial two issues and also: (3) an

9   Apprendi[3] issue (every fact that raises sentence beyond the statutory maximum had to be

10  submitted to the jury and proven beyond a reasonable doubt), (4) failure to have certain

11  sentencing elements appear in the indictment and tried by a jury violated due process.  The

12  United States ("government") moved to dismiss Claims 3 and 4 based on a time bar, and

13  answered Claims 1 and 2.  (Filings of October 26, 2000).

14          On March 29, 2001, James B, now represented by Ms. Luban, sought permission

15  to add two more claims: (5) an Apprendi issue (factors in imposing a 240 month term of

16  supervised release should have been presented to a jury and proven beyond a reasonable doubt),

17  (6) denial of right to testify.  On May 24, 2001, James B was given permission to file a "final"

18  §2255 motion, and the government's motion to dismiss was vacated pending filing of this

19  motion.  James B did so on May 31, 2001.  The claims in this petition (second amended § 2255

20  motion) were almost identical in their statement as those six claims previously described;

21  however, the Apprendi claims were slightly reformulated.

22  _____

23          [1] The issues raised and discussed on appeal were alleged Bruton error, prosecutorial
    misconduct, search warrant improprieties, improper procurement of a confidential informant's
24  testimony.

25          [2] Troy Barron also filed a § 2255 motion; however, that motion was not referred to the
    undersigned, and has been resolved by the district judge.

26          [3] Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000).

1   For the purposes of these <u>Findings and Recommendations</u>, the claims at issue are

2   limited to two and are set forth in the second amended motion as follows:

3   1.  Ineffective assistance of counsel with respect to waiving James B's right to

4   testify;

5   2.  Ineffective assistance of counsel due to conflict of interest.

6   As the undersigned stated in the order directing that an evidentiary hearing must

7   be held as to Claims 1 and 2, James B claims that his counsel was ineffective and conflicted

8   because he advised against James B testifying, even to the point of "refusing to allow" James B

9   to testify.  One might think that because James B waived his right to testify, the question of

10  ineffective assistance and conflict of counsel raising the same basic issue would also summarily

11  fail; however, the law is not that symmetrical.  It often gives back with one hand what it has

12  taken away with another hand.

13  An evidentiary hearing is required if the § 2255 motion's *allegations*, if proven

14  true, would entitle the movant to relief.  <u>United States v. Mejia-Mesa</u>, 153 F.3d 925, 929 (9th

15  Cir. 1998).  While palpably incredible allegations, when viewed against the record, need not be

16  accepted as true, <u>id</u>. at 931, the record has not been presented to the undersigned in sufficient

17  detail which would enable him to find that the mistaken identity allegations are palpably

18  frivolous.

19  James B alleges:

20  At the trial, the movant wanted to testify on his own behalf to rebut
    the government's witness' testimony/evidence that was used to
21  identify his voice as the person who was present during the
    recorded conversations, when the C.I. was wearing a
22  transmitter/receiver....he wanted to tell/show the jury that it was a
    situation of mistaken identity because the movant and his now
23  deceased brother (Ernest Barron) look exactly alike and had the
    same physical features.  The C.I. himself could not even compare
24  the differences between the movant and his brother.  The movant
    wanted to let the jury hear his voice first hand and allow them to
25  make the determination....

26  Memorandum filed May 30, 2000 at 1-2.

1    This court found earlier that the government presented much evidence against

2    James Barron, see Government's Consolidated Response, filed June 13, 2001, at 1-6, but that

3    given the limited knowledge about the evidence in the case at that time, it appeared that the

4    weight of that evidence depended on the CI's[4] identification of James B and the voice

5    identification of James B.  In ordering an evidentiary hearing, the undersigned noted that the

6    government argued that James B's asserted explanations of the evidence were "despicable," but

7    also observed that as this court did not preside at trial and did not hear the evidence, could not,

8    no matter the problematic nature of James B's assertions, find as a matter of law on the record

9    then presented that the assertions were palpably frivolous.  The undersigned found that to deny

10   an evidentiary hearing would just invite the inevitable remand from the Ninth Circuit to hold one.

11   See Order (& Findings and Recommendations), filed on 12/1/04, pp. 8-9.

12   Standards for Ineffective Assistance of Counsel

13   The test for demonstrating ineffective assistance of counsel is set forth in

14   Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

15   that, considering all the circumstances, counsel's performance fell below an objective standard of

16   reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

17   identify the acts or omissions that are alleged not to have been the result of reasonable

18   professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

19   whether in light of all the circumstances, the identified acts or omissions were outside the wide

20   range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

21   counsel's conduct was within the wide range of reasonable assistance, and that he exercised

22   acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

23   695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).   The Supreme

24

25   [4] The CI is identified in the Reporter's Transcript as Isaac Johnson.  RT 506, 1121.  CI
     stands for either "confidential informant," or according to one witness, "citizen informant."  RT
26   255.

1  Court has emphasized the importance of giving deference to trial counsel's decisions:

2          In Strickland we said that "[j]udicial scrutiny of a counsel's
            performance must be highly deferential" and that "every effort
3          [must] be made to eliminate the distorting effects of hindsight, to
            reconstruct the circumstances of counsel's challenged conduct, and
4          to evaluate the conduct from counsel's perspective at the time."
            466 U.S., at 689, 104 S.Ct. 2052.   Thus, even when a court is
5          presented with an ineffective-assistance claim not subject to §
            2254(d)(1) deference,[5] a [movant] must overcome the
6          "presumption that, under the circumstances, the challenged action
            'might be considered sound trial strategy.'"  Ibid. (quoting Michel
7          v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

8  Bell v. Cone, 535 U.S. 685, 698, 122 S. Ct. 1843,1852 (2002).

9          Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

10  693, 104 S. Ct. at 2067.  "Both deficient performance and prejudice are required before it can be

11  said that a conviction (or sentence) 'resulted from a breakdown in the adversary process that

12  render[ed] the result [of the proceeding] unreliable' and thus in violation of the Sixth

13  Amendment.'"  U.S. v. Thomas, 417 F.3d 1053, 1056 (9th Cir. 2005).   Prejudice is found where

14  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

15  proceeding would have been different."  Id. at 694, 104 S. Ct. at 2068.  A reasonable probability

16  is "a probability sufficient to undermine confidence in the outcome."  Id., 104 S. Ct. at 2068.  "If

17  either prong is not met, we must dismiss the claim."  U.S. v. Sanchez-Cervantes, 282 F.3d 664,

18  672 (9th Cir. 2002).

19          In extraordinary cases, ineffective assistance of counsel claims are evaluated

20  based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

21  1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

22  Procedural Background of Advice of Counsel re Right to Testify

23          Although the court will find herein, as part of its ruling, that counsel had no duty

24  to advise defendant of his right to testify at least from the aspect of whether counsel was

25  ───────────────

26          5 As here, in this § 2255 motion.

                                          6

1  constitutionally ineffective, it is informative to set forth counsels' actions in this respect for

2  background purposes.

3          Movant had two counsel in his federal drug trafficking trial, Robert Wilson and

4  Randolph Darr.  Mr. Wilson was appointed in May 1996, and remained counsel until he was

5  replaced (at movant's request) by Randolph Darr in March 1997.  See Exhibit 13 (Wilson

6  Declaration was adopted as his testimony on direct examination.  EHT (Evidentiary Hearing)

7  264.)  Mr. Wilson did advise his client about testifying, although Wilson's focus was to obtain a

8  good plea deal for his client.  EHT 274.

9              Among the considerations discussed regarding the decision
               whether to go to trial was the potential admissibility of James' two
10             prior felony drug convictions.  I recall that I explained to James
               that I could try to exclude the priors from use as impeachment at
11             trial, but that the judge would make that decision just prior to
               trial...It was my opinion that both priors would probably come in.  I
12             also advised James that if he testified and the priors were admitted
               against him, that evidence would be extremely harmful to our case.
13             For this reason, I advised James against testifying for the judge
               ruled against us on the admissibility of the priors.

14
               I have no recollection of advising James Barron that he had the
15             constitutional right to choose to testify regardless of my advice not
               to testify.  It is my usual practice to inform my client that the client,
16             not the lawyer, makes the ultimate decision about whether the
               defendant will testify.

17

18  Exhibit 13 at paras. 4-5.

19          At evidentiary hearing, within the space of two questions, Mr. Wilson opined that

20  he probably did, and then did not, advise James B that "you can testify if you want."  EHT 274-

21  275.

22          Randolph Darr came into the case fairly late in the game, and he too, at first,

23  worked on obtaining a good plea deal for James B.  When the plea deal was not resurrected, Darr

24  prepared for trial.  He was aware that James B desired to testify.  EHT 515-516.  Darr also came

25  to the conclusion that James B should not testify, and Darr let movant know that in no uncertain

26  terms.  EHT 518-520.  He did not tell James B that he could defy his lawyer's advice in this

7

1    respect.  EHT 520.

2            Q.  And this is during trial, right?  That you were dismissive of his
3            expression of his desire to testify?

4            A.  Well, I was – I guess I used the word dismissive, because
     during trial, they came up in a very limited time context, and so
5            there wasn't a lot of conversation.  There was some discussion
     before trial.  I don't think I'd be– I'd describe myself as being
6            dismissive before trial, but I think I made it clear to James that
     there was no way in the world I thought he should testify.

7    EHT 525.

8    Issues

9            The first question to be answered is whether counsel had a Strickland duty to tell

10   his client that he had right to testify even if, in his professional judgment and as a matter of trial

11   strategy, counsel believed the decision to testify would not benefit movant, and, indeed, would be

12   very prejudicial for him.  The second question, even assuming he had that duty and violated it, is

13   whether the failure to so inform his client meets the prejudice prong of Strickland requiring that

14   petitioner did not otherwise have the knowledge of the advice he professes to have lacked *and*

15   that confidence in the verdict be undermined.

16           The right to testify on one's own behalf at a criminal trial has been recognized by

17   the Supreme Court as deriving from several provisions of the Constitution, including from the

18   Fourteenth Amendment's due process clause ("[a] person's right to ... *an opportunity to be heard*

19   *in his defense*-a right to his day in court-" is "basic in our system of jurisprudence; and ...

20   include[s], as a minimum, a right ...to offer testimony...."); from the Sixth Amendment (in the

21   compulsory process clause wherein a defendant has a right to call "witnesses in his favor"); and

22   from the Fifth Amendment (in the right not to be compelled to incriminate oneself).  Rock v.

23   Arkansas, 483 U.S. 44, 51-52, 107 S. Ct. 2704, 2708-2709 (1987) [internal citations omitted]

24   [emphasis in original].

25           [I]n *Faretta v. California,* 422 U.S., at 819, 95 S.Ct., at 2533, the
     Court recognized that the Sixth Amendment "grants to the accused
26           *personally* the right to make his defense. It is the accused, not

8

counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' " (Emphasis added.)  Even more fundamental to a personal defense than the right of self-representation, which was found to be "necessarily implied by the structure of the Amendment," *ibid.,* is an accused's right to present his own version of events in his own words. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.

The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. In *Harris v. New York*, 401 U.S. 222, 230, 91 S.Ct. 643, 648, 28 L.Ed.2d 1 (1971), the Court stated: "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Id.,* at 225, 91 S.Ct., at 645. Three of the dissenting Justices in that case agreed that the Fifth Amendment encompasses this right: "[The Fifth Amendment's privilege against self-incrimination] is fulfilled only when an accused is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' ⋯ The choice of whether to testify in one's own defense ⋯ is an exercise of the constitutional privilege." *Id.,* at 230, 91 S.Ct., at 648, quoting *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 9 L.Ed.2d 653 (1964). (Emphasis removed.) [FN10]

> FN10. On numerous occasions the Court has proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right. See, *e.g., Nix v. Whiteside,* 475 U.S. 157, 164, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986); *id.,* at 186, n. 5, 106 S.Ct., at 1004, n. 5 (BLACKMUN, J., concurring in judgment); *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983) (defendant has the "ultimate authority to make certain fundamental decisions regarding the case, as to whether to ⋯ testify in his or her own behalf"); *Brooks v. Tennessee,* 406 U.S. 605, 612, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972) ("Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right"). Rock v. Arkansas, 483 U.S. 44, 51-52, 107 S. Ct. 2704, 2708-2709 (1987).

Rock v. Arkansas, supra, at 52-53, 107 S. Ct. at 2709-2710.

The Ninth Circuit has also recognized that "[a]n accused's right to testify is a constitutional right of fundamental dimension." United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993), citing, inter alia, Rock, supra, at 51-53, 107 S. Ct. at 2710; United States v. Edwards,

1   897 F.2d 445, 446-47 (9th Cir. 1990).  However, the trial judge has no duty to advise the

2   defendant of this right.

> Although the ultimate decision whether to testify rests with the
> defendant, he is presumed to assent to his attorney's tactical
> decision not to him testify. [] The trial court "'has no duty to advise
> the defendant of his right to testify, nor is the court required to
> ensure that an on-the-record waiver has occurred.'" [] Rather, if the
> defendant wants to testify, he can reject his attorney's tactical
> decision by insisting on testifying, speaking to the court, or
> discharging his lawyer. [] Thus, waiver of the right to testify may
> be inferred from the defendant's conduct and is presumed from the
> defendant's failure to testify or to notify the court of his desire to
> do so.

9   Joelson, supra, at 177 [internal citation and quotation sources omitted].

10       As movant's counsel explicitly and correctly confirms, with regard to the question

11  as to who is responsible for advising a defendant of his right to testify, it is "[c]ertainly not the

12  trial court;" citing United States v. Joelson, supra, 7 F.3d at 177 (9th Cir.), cert. denied, 510 U.S.

13  1019 (1993), counsel continues: "The trial judge is not required to advise the defendant of his

14  right to testify before the defendant may be considered to have waived that right, and in fact, an

15  inquiry by the court may be considered impermissible 'judicial interference with the decision

16  whether to testify.'"   Movant's Post-Hearing Brief (MPHB),[6] p. 14.[7]

17       The Ninth Circuit has said that it is primarily defense counsel's job, as opposed to

18  the trial court's, to advise a defendant as to whether or not he or she should testify and to explain

19  the tactical advantages or disadvantages of choosing to do so.  United States v. Wagner, 834 F.2d

20  1474, 1483 (9th Cir. 1987).

21       Movant also cites United States v. Martinez, 883 F.2d 750, 756 (9th Cir.

22  1989), vacated on other grounds, 928 F.2d 1470 (9th Cir. 1991), cert. denied, 501 U.S.

23

---

24     [6] All citations to the movant's post-evidentiary hearing brief are to the corrected brief,
    filed on June 1, 2006.

25

26     [7] The court uses the court's electronically stamped page numbering at the top of each
    page of documents filed, rather than the page numbers inserted by counsel.

1249 (1991), wherein the Ninth Circuit expressed concern that a court's advice to a defendant

concerning his right to testify could influence the defendant not to testify, and/or could intrude

into the attorney-client relationship.  Martinez, 883 F.2d at 760.  In Martinez, where the Ninth

Circuit found that the court has no duty to advise the defendant of his right to testify, there is an

extensive exegesis on the whole issue of waiving the right to testify (and on how knowledge of

the right not to testify is arguably more significant, id., at 756, a point noted by respondent).[8]

"Fundamental unfairness would characterize a process that let defendants have one trial based on

their lawyer's strategy and another trial based on their own," citing Strickland, 466 U.S. at 690,

104 S. Ct. at 2065-66.  Martinez, 883 F.2d at 761.[9]  See also United States v. Pino-Noriega, 189

F.3d 1089, 1096 (9th Cir. 1999); United States v. Nohara, 3 F.3d 1239, 1243-1244 (9th Cir.

1993).[10]

Duty to Advise of Right to Testify

        Hearing confirmed that the court has no duty to advise the defendant, the topic

turns to counsel's duty.  Movant argues that the evidentiary hearing showed that James B's trial

counsel never informed him of his right to testify, that James B asked his lawyer to allow him to

\\\\\

\\\\\

_____

    [8] RPHB, p. 17.  Respondent's Pre-Hearing Brief.  As previously ruled, this brief which
requested reconsideration of an evidentiary hearing could be utilized as a post-hearing brief.

    [9] "To hold that a defendant may abide by his lawyer's advice and not take the stand and
then invalidate the trial because he so acted is not fair to the government."  Martinez, supra, at
761.

    [10] The situation would be different if the court believed that the defendant might not be
competent;  the competency issue would overshadow the right to testify issue.  However,
whatever movant's mental deficiencies, no party contends that movant was incompetent to
proceed with his trial, i.e., not understanding the nature of the proceedings, or unable to assist his
counsel.  Also, not present here is the situation where a defendant is vocal in court about his need
to testify, but asserts that his counsel is unwilling to put him on the stand.  See e.g., United States
v. Webber, 208 F.3d 545, 551-52 (6th Cir. 2000).  With the controversy out in open court, a trial
judge might well have to advise the defendant that he (defendant) had the final call on whether he
should testify.

1   testify at least once during the trial and more than once prior to trial.[11]  The heart of James B's

2   contention is that his trial counsel "forcefully" refused to call him to testify "by dismissing his

3   requests to testify during trial, and by failing to inform movant that it was movant's ultimate

4   decision whether to testify – all with knowledge of Mr. Barron's intellectual limitations and Mr.

5   Barron's strong desire to testify."  MPHB, p. 2.  Trial counsel's conduct led movant to believe,

6   falsely but reasonably in the circumstances, that it was solely up to his counsel, and not movant's

7   right to choose, whether movant testified or not.  Id.

8            Movant contends that it is trial counsel's obligation to inform his client of his

9   right to testify (MPHB, p. 14), arguing that this court should adopt the Eleventh Circuit's rule

10  that defense counsel has rendered ineffective assistance of counsel if he does not protect his

11  client's right to testify "by honoring the client's desire to testify and by advising his client of this

12  right to testify and that the ultimate decision belongs to the defendant."  MPHB, p. 17, citing

13  United States v. Teague, 953 F.2d 1525, 1533 (11th Cir.), cert. denied, 506 U.S. 842 (1992).   In

14  Teague, the Eleventh Circuit "reaffirm[ed] that a criminal defendant has a *fundamental*

15  constitutional right to testify in his or her own behalf at trial" and that "[t]his right is personal to

16  the defendant and cannot be waived by either the trial court or by defense counsel."  953 F.2d at

17  1532 [emphasis in original], 1535.  Defendant's counsel is responsible "for advising the

18  defendant of his right to testify, the strategic implications of each choice, and that it is ultimately

19  for the defendant himself to decide."  Id., at 1533.

20

21          [I]f defense counsel never informed the defendant of the right to
            testify, and that the ultimate decision belongs to the defendant,
22          counsel would have neglected the vital professional responsibility
            of ensuring that the defendant's right to testify is protected and that
23          any waiver of that right is knowing and voluntary.  Under such
            circumstances, defense counsel has not acted " 'within the range of
            competence demanded of attorneys in criminal cases,'" and the
24

25          [11] Movant's counsel points out that testimony presented demonstrated that James B did
    not tell his counsel about his wish to testify several times during the trial as alleged in the
26  motion.  MPHB, p. 2.

1   defendant clearly has not received reasonably effective assistance
2   of counsel.

3   Teague, supra, at 1534, citing Strickland, supra, at 687, 104 S. Ct. at 2064, in turn quoting

4   McMann v. Richardson, 397 U.S. 759, 770-71, 90 S. Ct. 1441 (1970).  Interestingly, in Teague,

5   the court found that the district court's findings, after an evidentiary hearing, were that the

6   defendant did not show that his will had been "overborne," and that he had been advised of his

7   right to testify, that he should not exercise the right, and had failed to protest; thus, the appellate

8   court found that Teague himself had failed to meet the first prong of Strickland:

9           Moreover, although at the time of the evidentiary hearing counsel
            clearly had misgivings about whether Teague had understood that
10          he was choosing not to testify, a review of ineffective assistance of
            counsel claims must be made from the perspective of defense
11          counsel, taking into account all circumstances of the case as they
            were known to counsel *at the time of representation*. [Internal
12          citation omitted.] Teague's counsel clearly had advised him that it
            would be unwise and unnecessary for him to testify.  At the
13          evidentiary hearing, counsel testified that when she rested the
            defense case, she believed that Teague had assented or acceded to
14          her recommendation.  We find that counsel's performance was not
            constitutionally deficient.  Because the defendant has failed to meet
15          the first prong of Strickland, we need not address whether Teague's
            defense was prejudiced in this case.
16

17  Teague, supra, at 1535.

18          In another Eleventh Circuit case, the court, after citing Teague, found that a

19  petitioner who claimed at a second trial that his counsel failed to inform of his right to testify,

20  and that the ultimate decision to testify for or not was his (petitioner's) was rendered dubious in

21  light of the fact that he had attempted to assert his right to testify in the first trial.  Lambrix v.

22  Singletary, 72 F.3d 1500, 1508 (11th Cir.  1996).  In this case, movant James B. testified in two

23  priors cases in which he was a defendant.  Although he asserts that he regarded whether he

24  testified or not to be a choice made only by his counsel at whose behest he acted, rather than

25  upon his own determination at any of his trials, the fact that movant certainly knew that he could

26  testify at his trial cannot be doubted.

1    The court will not apply Teague for several reasons.  First, the Ninth Circuit, in

2    arguably ambiguous decisions, has determined that a waiver or forfeiture of the right to testify

3    precludes an ineffective assistance claim alleging that counsel did not advise of the right to

4    testify.  Secondly, counsel is not constitutionally tasked with advising about rights in the abstract.

5    Counsel is tasked with giving competent advice on whether the client should testify given the

6    situation presented to counsel.  *If* the situation clearly calls for advice not to testify in counsel's

7    estimation, that is the advice which should be transmitted to defendant, not a discussion about a

8    defendant's abstract right to overrule his counsel.  Moreover, in the context of advising about the

9    right to testify, the first Strickland prong merges with the second.  That is, even if counsel were

10   required to advise about the defendants' right to overrule his counsel on the self-testimony issue,

11   and counsel failed to so advise, an attack on the lack of such advice can only succeed if counsel

12   were in clear error for advising the defendant not to testify in the first place; otherwise there is no

13   prejudice.  There are no "structural defect" ineffective assistance of counsel claims.

14   Turning to the first reason, United States v. Nohara, 3 F.3d 1239, 1243-44 (9th Cir.

15   1993) held with respect to an ineffective assistance of counsel claim that the defendant's waiver

16   of the right to testify precluded the ineffective assistance claim as well.

17   > Nohara argues he was denied his Sixth Amendment right to
18   > effective assistance of counsel because his lawyer waived his right
   > to testify at trial and neither his lawyer nor the court informed him
   > of his right to testify.
19
   > This argument is precluded by United States v. Edwards, 897 F.2d
20   > 445 (9th Cir.), cert. denied, 498 U.S. 1000, 111 S.Ct. 560, 112
   > L.Ed.2d 567 (1990). In Edwards, the defendant wanted to testify,
21   > but the lawyer misunderstood him and did not call him as a
   > witness. Id. at 446. We held the court has no duty to advise the
22   > defendant of his right to testify, nor is the court required to ensure
   > that an on-the-record waiver has occurred. Id. When a defendant is
23   > silent in the face of his attorney's decision not to call him as a
   > witness, he has waived his right to testify. Id. at 447.
24

25   While it can be reasonably argued that Nohara was ambiguously focused on the trial court's lack

26   of duty to advise the defendant in the ineffective assistance context, the case did in fact hold that

14

1   a waiver of the right to testify (something already found in the previous Findings and

2   Recommendations) precluded the ineffective assistance claim itself.  Several unpublished Ninth

3   Circuit cases have interpreted Nohara in the same way.[12]

4           In United States v. Edwards, supra, 897 F.2d at 447, the Ninth Circuit, in denying

5   the defendant's appeal based on a contention that his counsel's decision not to allow him to

6   testify deprived him of his constitutional right not to do so found that the defendant's having

7   given no indication either to the prosecution or to the court that he wished to testify was enough

8   to constitute a valid waiver of that right.  Edwards noted that in Martinez, 883 F.2d at 760, the

9   Ninth Circuit had "'join[ed] other circuits and the majority of states in concluding that the court

10  had no duty to advise the defendant of his right to testify, nor is the court required to ensure that

11  an on-the-record waiver has occurred."  Silence on the part of defendant in the face of his

12  counsel's decision not to call him as a witness is the conduct from which a waiver is inferred.

13  Edwards, 897 F.2d at 446.

14          The Edwards' court noted a distinction from Martinez in an aspect that makes the

15  facts of Edwards analogous to movant's claim herein, that is:

16              in Martinez, the defendant "knew he had a right to be heard if he
                chose," id. at 761, while in the present case Edwards contends that
17              he was unaware of this right.  There is some suggestion in
                Martinez, that this distinction is significant - Martinez states that
18              "to waive his right all that [the defendant] needed to know was that
                the right existed," id., thereby implying that if the defendant had
19              not known the right existed he might not have been able to waive
                it.
20       Id.

21          Like movant herein, in other words, the defendant in Edwards also

22  asserted ignorance of the fact that he had a constitutional right to testify in his own defense, in

23  the face of his attorney's determination that he should not.  Notwithstanding this claimed

24

25              [12]  See e.g. Stephens v. State of California, 28 F.3d 108, 1994 WL 201138  (9th Cir. 1994).
        While the undersigned is not citing the on-point Stephens case as precedent, and cannot at this
26      juncture, it is informative that the undersigned is not alone in his Nohara interpretation.

1   ignorance of his constitutional right to testify, the Ninth Circuit held that defendant's silence at

2   his trial waived his right to testify for himself at his trial because to do otherwise would be to

3   impose a duty upon the court to inform a defendant of his right to testify.  Edwards, 897 F.2d at

4   447.

5          But even apart from precedent, the undersigned would not find counsel ineffective

6   because he did not offer advice to his client which he thought deleterious to his client's best

7   interests.  Strickland requires competent advice; it does not require a primer on constitutional law

8   to be given to the defendant.  It is not important that movant herein understood the legal

9   landscape about his right to testify (or had the mental where-with-all to completely comprehend

10  such); it is important that counsel conveyed his belief that testifying would be inimical to

11  movant's interests.  This is especially so in this situation where movant, from his prior

12  experience, certainly knew that he could testify in court whether or not his federal trial counsel

13  specifically advised him of that right.

14         Movant cites briefly the ABA Standards Relating to the Administration of

15  Criminal Justice which includes "whether to testify in his own behalf" among "the decisions

16  which are to be made by the accused after full consultation with counsel...."  MPHB, p. 15.

17  With respect to any practice that may be recognized by the ABA for achieving the level of

18  consultation which may be ideally desirable, the failure to implement any such recommended

19  procedure or practice does not, of itself, implicate a constitutional right.  "[T]he fact that the

20  ABA may have chosen to recognize a given practice as desirable or appropriate does not mean

21  that practice is required by the Constitution."  Jones v. Barnes, 463 U.S. at 753 n. 6, 103 S. Ct. at

22  3313 (reversing Second Circuit, and holding that a criminal defendant does not have a

23  constitutional right to have appellate counsel raise every nonfrivolous issue the defendant

24  requests).

25         Thus,  movant's counsel's exhaustive presentation on the mental slowness and

26  inabilities of her client to understand that he could override counsel's advice misses the point in

1   the ineffective assistance duty aspect.  Certainly, as a legally competent defendant, James B.

2   knew that his counsel was telling him that it would be "suicidal" for him to testify.  The record in

3   this case could lead to no other conclusion.  This was the advice he was entitled to, assuming that

4   such advice was not patently unreasonable.  Whether he also knew that he could override his

5   counsel's advice does not implicate the effectiveness of his counsel.  Whether counsel should

6   have realized, in hindsight, that his client was not the sharpest knife in the drawer, and hence

7   needed to be advised of his rights in triplicate so to speak – again misses the point.  It is the

8   substantive advice itself of counsel on whether to testify which is the critical issue.  Counsel can

9   be ineffective for giving unreasonably deficient advice on whether to testify, but it is only the

10  quality of that advice which may be challenged.  For example, if a competent counsel surely

11  would have called his client to testify because his testimony was the make or break of a case, and

12  impeachment was only of subsidiary concern, a deficient counsel's advice not to testify can be

13  challenged.  And, it can be challenged whether the defendant was extremely dull, sharp as a tack,

14  or somewhere in between.[13]

15          Earlier, the undersigned pointed out the interrelationship of counsel's

16  reasonableness in advice not to testify, and the prejudice analysis concerning that advice.  The

17  court now turns to that aspect of the case.

18  Prejudice

19          There are two aspects of the prejudice analysis, both of which movant fails to

20  overcome.  The first aspect is, regardless of whether petitioner was advised that he could testify

21  despite his lawyer's advice, the facts before and at trial rebut movant's present day contentions

22  that he was unaware that he could exercise his rights in this regard.  This is also so regardless of

23  _____

24          [13]Although the undersigned gave movant's counsel a full opportunity to present evidence
    on her client's mental deficiencies, this did not mean that the court believed such evidence to be
25  ultimately pertinent.  As the undersigned ruled previously, although there was much pre-hearing
    doubt that mental acuity evidence would be pertinent, the state of the record at that time required
26  the undersigned to grant an evidentiary hearing.  Movant was permitted to "make his record" as
    his counsel saw fit.

1    his claimed mental slowness which the court will accept for the purposes of this argument.

2           Movant argues that the evidence presented at the hearing demonstrated by a

3    preponderance of the evidence that counsel failed to discharge his obligation to adequately

4    inform movant that he had the right to testify and that this right was the client's personal

5    right, in a manner reasonably calculated to enable movant to make an informed

6    decision.  MPHB, p. 33.  His intellectual deficiencies, according to movant, were known to his

7    trial counsel, requiring an explicit explanation that the decision whether to testify belonged to the

8    client, to enable him to intelligently waive or exercise his right to testify, and that counsel's

9    forceful assertions that movant's testifying was out of the question led to movant's unknowing

10   waiver of his right to testify.   Id.  Movant argues that "two fine attorneys," Mr. Dorfman and Mr.

11   Blasier [despite these proclaimed mental deficiencies], chose to call him to testify in prior trials,

12   despite prior convictions.

13          However,  no party has contended that petitioner was not competent to stand trial.

14   The Supreme Court, as respondent observes, has held that the degree of competence that is

15   required to plead guilty or waive one's right to counsel is identical to that which is necessary for

16   a defendant to stand trial.  RPHB, pp. 26, citing Godinez v. Moran, 509 U.S. 389, 113 S. Ct.

17   2680 (1993).  In United States v. Hayes, 207 F. Supp.2d 944 (S.D. Iowa 2002), a federal

18   defendant had extensive involvement with the justice system, had pled guilty before but had

19   never gone to trial, had no high school diploma but had earned a GED in prison, and claimed he

20   did not know he had a constitutional right to testify.  His trial counsel never recalled telling the

21   defendant that he had a right to testify.  The defendant's silence, his apparent acquiescence at

22   trial, was a waiver of that right, because the "accused must act affirmatively in these

23   circumstances," citing United States v. Bernloehr, 833 F.2d 749, 752 (8th Cir. 1987), in turn

24   citing United States v. Systems Architects, Inc.  757 F.2d 373, 375 (1st Cir. ) cert. denied 474

25   U.S. 847, 106 S. Ct. 139 (1985); United States v. Janoe, 720 F.2d 1156, 1161 n. 6 (10th Cir.

26   1983) cert. denied 465 U.S. 1036, 104 S. Ct. 1310(1984).  Thus, petitioner's ability to understand

his rights and act accordingly – including waiver – is set at the level of a competent defendant – not on some type of sliding intellectual scale as proposed by movant's counsel.[14]

Movant herein is an individual who had not only testified in two prior trials but who also was sufficiently strong-minded to challenge his attorney's advice and to take the initiative to address Judge Levi, on the day which had been set for the commencement of the underlying trial in this matter, for the purpose of firing his then trial counsel, Mr. Wilson:

> Mr. Wilson: Your Honor, my understanding is we do have an outstanding offer.  Mr. Barron asked to address the Court.  I advised him that anything he says can potentially be used against him should further proceedings be brought against him or should the offer not go forward.  *I've advised him that it would be against my advice for him to discuss something with the court without having first discussed it with me.*
>
> With that, all I can do is allow Mr. Barron the opportunity to speak.
>
> The Court: Having heard what your attorney just said, do you want to speak?
>
> The Defendant: Yes, I do.

RT 14 [Emphasis added].

Movant, after commenting about some errors in an affidavit related to a plea offer, stated: "I'm firing my attorney."  RT 15.  Whether movant has a low I.Q. or not, he certainly does not appear to have been afraid to address the court directly or to assert himself counter to his legal advisor.   That he believed that he could not question or defy Mr. Daar's authority to determine whether or not he could take the stand to testify in his own defense is undercut by this prior interaction.

---

[14]  Movant's contention that the advice a defendant receives, either from his counsel or his experience or by others, has to be constitutionally viewed on a spectrum depending on the level of a defendant's mental acuity poses all sorts of problems for an advising counsel.  Counsel could only advise of constitutional rights after having their client meet with psychologists, who would, after much testing, set some level of the defendant's intelligence, the results of which would guide the level of advice.  Of course, counsel's failure to completely understand the mental make-up of his client would subject any conviction to post-judgment attack.  That is why the Supreme Court has set the intelligence bar at only one spot – competence of the defendant to proceed to trial.

Moreover, James B was present at trial when the subject of all defendants'
testimony came up, and one counsel expressly "advised" that the decision to testify was that of
his client.

- Before the government called the CI, there was a conference
  outside the presence of the jury in the defendants' presence during
  which the audibility of the tape recordings and accuracy or
  inaccuracy of the transcripts were discussed.  RT 1081-82, 1086-
  89, 1094-1103.  During this discussion, the tapes were played for
  the district judge to hear and compare to the transcripts. This
  specifically included the March 26 recording of James B's voice on
  his pager voicemail message, and the enhanced portion of the April
  4 meeting where the CI purchased drugs from both James and Troy
  Barron. RT 1097-98, 1099-1103.  During a discussion regarding
  scheduling, both Mr. Clymo on behalf of Troy Barron and Mr.
  Prantil on behalf of Latrina Williams indicated that they did not
  intend to call any defense witnesses, while Mr. Daar did not fully
  reveal his plans for the defense case. RT 1091-93.

- After the CI testified, another conference occurred outside the jury's
  presence, in which Mr. Prantil re-affirmed that Ms. Williams would not
  testify, Mr. Clymo re-affirmed he would present no witnesses, and Mr.
  Daar was again evasive - about which the district court commented. RT
  1292, 1297, 1302-4.  During this conference, Mr. Prantil revisited the
  Bruton issue and the redaction from his client's post-arrest statement of
  what he characterized as exculpatory statements. RT 1295. The court
  inquired whether she would testify, and Mr. Prantil responded: "She's
  decided not to.  *That is her right to testify*, and she advised me she does

20

1   not want to testify." RT 1297. A little later the court said: "She is certainly

2   entitled not to testify. But she's not entitled to testify through other people.

3   That's hearsay." RT 1298. James B was present during this conversation

4   is likely to have been paying attention because at issue were Ms. Williams'

5   statements that incriminating to him - that she lately had refused to make

6   deliveries for James Barron, and that he was a dangerous individual. RT

7   1296 (emphasis added).

8       *Taken together*, the facts that movant, James B, had testified on previous

9   occasions, had, in fact, challenged his counsel's advice in court, and was advised, albeit by

10  another counsel, of his "right to testify" overcome the latter day presentation that movant was

11  completely at sea with respect to his testimonial rights. Judged from the level of a "competent"

12  defendant, movant was not prejudiced by any asserted lack of advice that he could overrule his

13  counsel.

14      The *second* aspect of prejudice has to do with the fact that the outcome of the trial

15  would not probably changed had James B testified, i.e., the undersigned's confidence in the

16  outcome is not undermined. Even if movant were correct that failure to advise a defendant that

17  he can testify despite your advice that he not, in ways fit for his mental acuity, is a per se

18  unreasonable act under the first prong of Strickland, movant must also demonstrate prejudice to

19  the outcome, i.e, that his non-given testimony undermines confidence in the outcome of the case.

20          Moreover, Egger had a very good reason for suggesting that Dows
            not testify. Dows had three prior convictions for robbery and

21          assault, which, in all likelihood, would have been admitted to
            impeach Dows on the stand if he testified.... As noted with some

22          irony by the trial court, if Eggers *had* allowed Dows to testify
            under this scenario, that would be definite proof that he was

23          suffering from Alzheimer's disease. Dows cannot prove deficient
            performance or prejudice based upon his failure to testify at trial.

24

25  Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000) (claim that an attorney had denied a defendant

26  his right to testify).

In a D.C. Circuit case, respondent noted that the court addressed only the question of prejudice where a movant/defendant filed a § 2255 motion arguing that his lawyer had rendered ineffective assistance when the defendant had informed him that he wanted to testify[15] and the attorney did not take steps to preserve the right when defendant became ill.  RPHB, pp. 18-19, citing United States v. Tavares, 100 F.3d 995, (D.C. Cir. 1996).  Noting that the government did not contest movant's contentions with respect to the question of the inadequacy of counsel's performance, the court stated: "[t]he only question before us is whether [movant] was prejudiced by his counsel's actions - specifically by [his counsel's] failure to ensure that [movant] had an opportunity to testify." Id. at 997.[16]

In a recent district court case in North Carolina to which the instant case bears some resemblance, movant averred that he was denied his right to testify by his counsel's putatively deficient performance in failing to inform him that it was ultimately movant's decision whether to do so or not and had he testified, he would have averred that he had not conducted the cocaine deals at issue therein.  McCoy v. United States, 2006 WL 1896601 *8 (W.D. N. C.  July 6, 2006).  While acknowledging that it is well-settled that a criminal defendant has a constitutional right to testify on his own behalf, the court first observed, nevertheless, that "advice provided by a criminal defense lawyer on whether his client should testify is a 'paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." Id. at *7, quoting Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002), in turn quoting Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983).  In assessing prejudice, the court weighed what petitioner would have testified to against what he did not intend to testify about, finding that the

---

[15] Although respondent asserts, RPHB p. 18, that movant in Tavares wanted to testify against his counsel's advice, the advice against testifying appears to have been predicated only on the fact that the defendant was ill and not as a part of trial strategy or tactics per se.

[16] Even assuming "counsel's performance constituted unreasonable professional error, the petitioner must further show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." Toomey v. Bunnell, at 743-44, citing Strickland, at 694, 104 S. Ct. at 2068.

1    jury would have been unlikely to put much stock into what the court characterized would have

2    been petitioner's self-serving denials.  McCoy, supra, at *8.

3                In order to assess prejudice, the court must assume that absent his counsel's

4    actions, movant would have testified as he has described.  In this case, perhaps, it is more

5    accurate to say that having been informed that the decision to testify or not rested with him,

6    James B would have testified regarding the identity of the voice on an undercover tape; that is,

7    the purpose for which movant sought to testify was to demonstrate that it was not his voice on an

8    undercover tape on April 4, 1996, identified by the confidential informant (CI) as that of James

9    B.  As noted, counsel advised movant not to testify because he thought the evidence of the two

10   (or more) drug prior convictions would have been fatal.  As respondent pointed out in response

11   to the second amended § 2255 motion, James B had prior convictions, inter alia, involving crack

12   cocaine, the drug at issue in this case.  Movant was convicted of possession of cocaine base for

13   sale in August of 1987 and sentenced to one year in jail and five years (60 months) probation.

14   Government's Exhibit F, Information Charging Prior Convictions pursuant to 21 U.S.C. § 851;

15   Government's response, filed 6/13/01, p. 12, and Exhibit (Exh.) 2, movant's criminal record.

16   While still on probation for that conviction, having served the jail term, movant was convicted of

17   possession of cocaine base for sale, as well as possession of a controlled substance and being a

18   felon in possession of a firearm, for which he appears to have received a twelve-year prison

19   sentence.[17]  Id.  That the priors would have been admitted as impeachment is far more likely than

20   not as evidenced by Judge Levi's ruling on the question of whether the priors could be used in

21

22        [17] In the pre-hearing brief, respondent alludes to three, rather than two, drug trafficking
     priors that could have been used to impeach movant, but does not specify them.  RPHB, p. 2.
23   Government's Exhibit F, Information Charging Prior Convictions pursuant to 21 U.S.C. § 851,
     contains abstracts of judgment copies specifying two convictions for possession of cocaine for
24   sale and one for possession of a controlled substance (cocaine).  In the 6/13/01 response by the
     government to the second amended motion, movant's criminal history at Exh. 2, indicates that,
25   inter alia, movant had been previously twice convicted, in 1987 and 1989, of possession and
     purchase of cocaine base for sale, for which latter conviction he was evidently sentenced to 12
26   years in state prison, and once convicted for being in possession of a narcotic controlled
     substance, on 2/23/89.

1    the government's case in chief.  While Judge Levi made clear that he would not permit evidence

2    of the prior convictions, under Fed. R. Evid. 404, to come in during the prosecution's case in

3    chief, he left the door wide open as to what would occur if movant chose to testify:

4            Now, that doesn't mean that if they testify, that they [the priors]
             could not be used for impeachment.  And it's possible that I would
5            permit the government to go into these matters on rebuttal, but not
             in its case in chief.

6

7    RPHB, attachment 1, RT,[18] vol. 1, p. 40.

8            Judge Levi reserved his ruling on the government's motion under Fed. R. Evid.

9    609.  Had movant taken the stand in his own defense, there is little doubt that the government

10   would have been allowed to impeach movant's credibility with the priors.  It is speculative only

11   that, as movant asserts, the district judge might have limited impeachment to the fact of the prior

12   convictions without having their nature revealed.  MPHB, p. 31.  It is certainly questionable

13   whether having the felony priors uncharacterized and left to jurors' imaginations would lead the

14   jury to regard movant's testimony more favorably than if the nature of the offenses were

15   revealed.

16           Whether counsel for the defense could or might have sought to soften the blow by

17   bringing evidence of the prior convictions out on direct examination of movant, a tactic not

18   mentioned by the parties, and thus, purely speculative herein, rather than waiting for a

19   devastating cross to flush it out could only go so far to limit the damaging fall-out from the jury's

20   awareness of these prior convictions when they went to deliberate.  Even if the jurors were able

21   to limit the evidence of the priors simply to the question of movant's credibility, it is almost

22   axiomatic that such credibility would have been seriously undermined.  Movant's reason for

23   taking the stand is likely to have been almost wholly undercut by the evidence against him on

24   \\\\\

25

26           [18] Reporter's Transcript on Appeal.

                                              24

1   related convictions which would have been presented, almost wholly defeating the purpose of his

2   testimony.

3         In addition, as the government pointed out in its initial response to the second

4   amended motion, movant would have subjected himself to cross-examination as to the evidence

5   against him, including: the identification of movant, not his deceased brother, as a crack cocaine

6   dealer by the CI, a number of law enforcement agents, one of his co-defendants, and the resident

7   of a house in which drugs and cash were stored; movant's instructions about his crack cocaine

8   dealings from an audiotaped drug transaction also watched by law enforcement agents; movant's

9   living brother's voice on audiotape discussing movant's (James B's) cocaine dealing business;

10  movant's name and pager number found in the house with 1.5 kilograms of cocaine base; drug

11  ledger and two pagers found by agents at movant's residence; movant's "incredible" post-arrest

12  statements alleging that his only connection to the drug deal locations was his "phantom" lawn

13  mowing business.  Govt.'s response, filed 6/13/01, pp. 12-13.

14        In arguing for prejudice, movant contends that the government's case against

15  James B rested largely on the CI's testimony that he bought drugs from movant and that it was

16  movant's voice on the April 4, 1996 tape, and that no agent was ever in close enough proximity

17  to verify that an exchange took place between the CI and movant.  MPBH, p. 29.   The credibility

18  of the CI, movant avers, was suspect, as James B was targeted by the probation officer who

19  recruited the CI, and the CI's promise of leniency was contingent on the CI purchasing a

20  specified quantity of crack cocaine from James B himself.  Id., citing RT 1177-1179.  Movant

21  argues that because the April 4 purchase took place inside the garage at the Loucretta address,

22  police observers were not able to verify whether movant was involved in the transaction or not.

23  MPHB, p. 26.  The CI lied when he testified that the motorcycle rider removed his full-face

24  helmet; Detective Martin (a sergeant at the time of trial) testified that the rider did *not* take off

25  the helmet.  Id., citing RT 301, 304.  James B, according to his trial counsel, Randolph Daar,

26  wanted to testify to deny the allegations or knowing the informant and to provide evidence as to

other possible theories and explanations, such as that the voice on the April 4 tape was not his,

that the person who the CI dealt with was his brother Ernest, with whom he was often confused.

MPHB, p. 25, citing EHT[19] 527.  Mr. Daar would likely have called James to testify, but for the

prior convictions.  Id., citing EHT 550, 554.  Movant now claims that James B's testimony

would have served him not only on the issue of the voice identity on the "critical" April 4

bodywire tape, but, since mistaken identity was a central defense theory, James B's testimony

would also have been helpful to testify that the informant and the task force agents had mistaken

James for his brother Ernest because James and Ernest looked much alike and were occasionally

mistaken for each other.  MPHB, p. 26, citing EHT 157, 179, 187, 215.  Their builds, height,

facial features, large heads, and close-cut haircuts were similar.  Id., citing EHT 188, 214.  The

court notes that movant's ex-wife, Dierdred Barron, testified that there was a difference in their

skin tones, with James B having a lighter skin tone; although Ms. Barron said that Ernest Barron

and James B had been mistaken for the other, she could not recall any such specific instance.

EHT 214.  She also stated that James was taller than Ernest.  EHT 215.

James B testified that Ernest weighed 250 lbs and was 5'10 or 11" tall, and James

weighed 260 at the relevant time, and is 6' 1/2" tall.  James described Ernest as "a little wider."

MPHB, p. 27, citing EHT 100-101.  While movant avers that the photos of James and Ernest

show their similar appearance and build, id., citing Exhs. 1-5, after reviewing the photographs the

court finds the photographs of James and Ernest show them to be similar in some respects but not

difficult to differentiate.

Movant states that trial counsel Daar, felt there was at least a reasonable doubt

that the voice on the April 4 tape which the CI said was James' was not the same as James' voice

on his answering machine and, on that basis, urged the jury in closing argument to compare the

voice on the tape with James' voice.  MPHB, p. 27, citing EHT 529-530.  Former trial counsel

---

[19] Evidentiary Hearing Transcript.

1   Robert Wilson agreed that there was room for argument that the voice on the tape was not James'

2   voice.  Id., citing EHT 277.  Mr. Wilson, however, did state, the court observes, that the tape had

3   "qualities to it that were consistent with James," but he had never heard Ernest's voice.  EHT

4   277.

5          In response to a question from the court, Mr. Wilson stated that the April 4 tape

6   was "a very significant part of the case because everything else was pretty much circumstantial,

7   and the problem with the tape was, the only way to refute it, was to either say it was his brother,

8   or it was--wasn't James."  EHT 276.  Mr. Wilson stated that the quality of a wire tape was

9   always less than that of audio tapes, due to the muffling and intervening sounds caused by an

10   informant's clothing and the transmission by radio waves and those deficiencies were present

11   with the subject tape.  EHT 277.

12          Movant avers that another important area that he could have been addressed in

13   testimony was the allegation based on aerial surveillance that he (James B) was engaged in

14   counter-surveillance driving on a particular night.  James B could have testified that on that

15   night, he and his then-fiancé were out with family celebrating their wedding rehearsal, and that

16   they were racing each other to certain locations to pick up friends.  MPHB, p. 27, EHT 551-52.

17   Although movant concedes that a defense witness did testify about the racing and indirect route,

18   RT 1399, had James testified, movant argues, that witness account would have corroborated

19   James' recounting, thus supporting the credibility of James' other testimony as well.  MPHB, p.

20   27.

21          Moreover, Mr. Daar acknowledged other helpful facts James could have testified

22   to, such as "the house, the garage, who was there on that day, who was coming and going, what

23   that scene was like...."  MPHB, p. 28, EHT 527.  These facts were relevant, movant contends,

24   because the most incriminating conversation between the CI and the person he claimed was

25   James B took place behind closed doors in the garage, where the Barron brothers and their

26   friends would gather to play cards.  MPHB, p. 28.  Thus, according to movant, he could have

provided an innocent explanation for what went on in the garage at the Loucretta address when he was seen there and could have given an explanation for his presence at the door of the co-defendant's home to explain the purported observation from aerial surveillance of his possible use of a key to open the door.  MPHB, 28, citing ENT 552-53.

Movant also argues that Mr. Daar thought that he (James B) would have been likely to make a favorable impression on the stand, quoting the following testimony on that issue in response to a question from the undersigned (MPHB, p. 28):

> I mean, I think he could have pulled it off. I think he had a
> straightforward manner when he was on. I mean, certainly he could
> have had an off day, an emotional reaction and could have wind
> [sic] up screaming at the prosecutor, I mean, that would be a risk.
> But I think without his priors, and with enough time with him, we
> could have done something.

EHT 557.

The court finds trial counsel's statement to be less than a whole-hearted endorsement of the idea of James B testifying even without the priors; he expressed some concern about what he speculates could have been a volatile interaction between movant and the prosecutor under cross examination.

Movant argues that it is noteworthy that James had testified twice before, in 1988. However, movant makes no representation as to the relative success or failure of such a trial strategy in those cases.  Movant observes that Mr. Daar testified that had he been apprised of the fact that James B tested at a 67 IQ and was either mildly or moderately retarded, Mr. Daar would have been encouraged to call him and to use this information in his defense to argue that it created a reasonable doubt as to whether James "could function as this person that the cops were describing him as, organizing, distributing, doing all this countersurveillance, and all this rather sophisticated reasoning."   MPHB, p. 28, quoting EHT 557.  On the other hand, as movant also notes, Mr. Daar acknowledged that retardation would present a problem in James understanding "the game" (of how to conduct himself on cross), and that James had a "whole emotional history with Ms. Duarte."  MPHB, p. 28, quoting EHT 558.  Notwithstanding,

1  however, without the priors, Mr. Daar felt James' testimony would have been helpful to the

2  defense.  MPHB, p. 29, citing EHT 558.

3          Movant contends that the most critical aspects of the CI's story were not

4  corroborated by police.  MPHB, p. 30.  Although the informant testified that he called and paged

5  James B at various times, there was no recording of that, nor did any officer observe the number

6  dialed or entered, according to movant.  Id.  However, the court notes that Agent Yamada

7  testified that on at least one occasion he directed the CI to page James B and observed him

8  entering the pager number for James B several times and that at least one of the pages was

9  recorded on that occasion.  RT 128.

10         Movant states that observations of the Loucretta residence of a man believed to be

11 movant were from vantage points 200 to 300 feet away, or from the air.  MPHB, p. 30.  Every

12 drug transaction about which the CI testified took place inside a building or a vehicle, not

13 directly observed by agents.  Id.  The first few transactions were unrecorded.  Id., Detective

14 Martin (a sergeant at the time of trial) observed Troy Barron doing actions that looked like drug

15 sales – but not James B.  MPHB, p. 30, citing RT 255.  The taped conversations involving drugs

16 took place behind closed doors, so that no agent could independently verify the CI's claims that

17 the speakers were James B and Troy.  Id., citing RT 1149, 1152-53.  The body-wire tapes were

18 of poor quality and hard to understand, even the enhanced April 4 tape.  Id., citing EHT 277, 515.

19         Movant argues that there was ample room for error in the purported

20 identifications, supporting James B's mistaken identity theory.  MPHB, p. 30.  Det. Martin's

21 identification of James B as the motorcycle rider making a drug delivery was made from either

22 200 or 300 feet away, with the rider wearing a full-face helmet.  Id., citing RT 301-306.  The

23 same officer, the court notes, also testified that the rider was driving directly toward him and he

24 was observing him at that point through binoculars.  RT 304.  Movant avers that the same

25 officer's stated identification of James B as the person who entered the stash house was made

26 from a surveillance plane, and was based on observation of the person's size and build.   RT 314.

29

1   However, this is somewhat misleading because what Det. Martin testified to on cross-

2   examination by Mr. Daar was that in the plane he "was able to pick out a subject with a build

3   similar to Mr. [James] Barron, and another unit on the ground identified the clothing as far as top

4   and bottom, shirt and pants, and identified that subject as Mr. Barron."  RT 314.   Movant points

5   to testimony by an officer who was uncertain of whether a photograph he had seen was of Ernest

6   Barron or James Barron, and the same officer even arguably mistook Troy for James. MPHB, p.

7   30, citing RT 511.  On that latter point, Officer Jow testified that he had simply identified Troy as

8   the primary [target of investigation] leaving the Loucretta Street address, rather than James B,

9   who was the "primary," but that he realized his mistake when he saw James B leaving the

10  Loucretta address (some time after Troy had left).  RT 511-12.  Although Officer Jow professes

11  to no confusion as to the identity of James B, it is somewhat confusing that he states that he

12  realized he had called the wrong person in as the primary to the surveillance team, only after he

13  saw James B emerge from the house later.

14          In the government's pre-hearing trial brief, counsel offered a detailed exposition

15  and a clarification of the evidence to attempt to rebut movant's "mistaken identity" allegations.

16  RPHB, pp. 1, 3-15.  In addition to the CI's identification of James B as the individual in drug

17  transactions with him on February 8, 1996, and on April 4, 1996, as well as his identification of

18  James B's voice as the one on the April 4, 1996, tape, there was a voice recording of defendant's

19  voice on his own pager which was presented; eyewitness identification of defendant by law

20  enforcement personnel, who testified to observing movant engaged in drug dealing activity with

21  the CI and with a different person, who was a known dealer in rock cocaine.  RPHB, pp. 1-2.

22  Moreover, there were law enforcement witnesses who testified about the distinctions between the

23  physical appearances of Ernest and James Barron.  Id. at 2.

24          The court has independently verified the points made by the government in its

25  prehearing brief at pages 3-16 by a review of the record, and, where necessary, has modified the

26  government's assertions and occasionally altered and/or added pages cited by the government to

30

the Reporter's Transcript of the trial:[20]

- After his December 19, 1995, arrest, the CI cooperated with law enforcement to obtain a reduced sentence for a possession for sales of crack cocaine charge, providing James B's name to Sacramento Probation Officer Randy Yamada as someone about whom he could provide information.  R.T. 94, 96, 1121-1126, 1204, 1175-76, 1232.

- Yamada testified that the CI identified the 7605 Loucretta[21] Street address as a place where the CI had previously purchased crack cocaine.  R.T. 94-95, 100, 104.  The CI testified that about three weeks after his release from custody, he saw James B on 33rd Street and obtained his pager number.  R.T. 1180, 1182-83, 1205, 1228, 1230.

- Sergeant Daryl Martin, at the time a Sacramento police detective assigned to the Crank Rock Impact Project Sacramento (CRIP) narcotics task force, testified that he was involved in surveillance in this case. R.T. 250-52.  On February 8, 1996, Martin was watching the 7605 Loucretta residence from 170 to 200 feet away with binoculars. R.T. 253. Martin saw numerous people engage in hand to hand exchanges with Troy Barron. R.T. 253-54.  Martin saw the CI drive up and speak with Troy Barron. R.T. 255.

- The CI testified that, when he arrived, Troy Barron was there, as well as a few other people the CI didn't recognize, who had been cutting lawns.  R.T. 1183-84, 1242.  Minutes after the CI arrived, Martin saw James B arrive and saw the CI speak with James B; Martin was already familiar

---

[20]  The court has occasionally added page references to the Reporter's Transcript.

[21]  In the government's brief the street is spelled "Loucreta," and movant's post-hearing brief spells the street as "Lucretta," but in the reporter's transcript of the trial, it is spelled "Loucretta," the spelling used herein.

with James B's appearance.  R.T. 256. Martin testified that James B went inside the residence, and a few minutes later he came back out front, had more conversation with the CI, then got into a red El Camino and left. R.T. 257. Martin testified that someone on a motorcycle arrived at the Loucretta residence and parked on the wrong side of the street and the CI walked over to that person, extending his hand to give him something.  R.T. 259. When the motorcyclist left, he rode toward Martin, who was able to identify him as James B.  R.T. 260, 302, 304-05. Martin then identified James B, sitting in the courtroom, as the same person whom he saw engage in the hand-to-hand drug transaction with the CI. R.T. 260-61. The motorcyclist had come from the same direction the red El Camino had gone, according to Martin. R.T. 299.

- The CI testified that James B took off his motorcycle helmet before handing him (the CI) the cocaine. R.T. 1184-85. Sgt. Martin, on the other hand, testified that James B never removed his helmet.  R.T. 301.  James B's counsel, Mr. Daar, cross-examined Sgt. Martin extensively about his ability to identify James B on the motorcycle, as he was wearing a full-face motorcycle helmet. R.T. 300-6.  Martin was not asked about James and Troy Barron's brother, Ernest, and there was no testimony about him in connection with this event.  On re-direct examination, Martin testified to the differences in James and Troy B's appearances. R.T. 368.  Mr. Daar recalled Martin as a defense witness. R.T. 1409. Mr. Daar brought to court a full-face helmet and had James B (movant) put it on and lean forward as Martin said he was doing on February 8 when he identified him.  R.T. 1411-12. Under the prosecutor's examination, Martin testified that he recognized James B because of his nose, "the way the helmet makes his

1    cheeks sit up," his large head, his build, and his clothing. R.T. 1413-15.

2    Upon Mr. Daar's further examination, Sgt. Martin continued to testify that

3    he believed the clothes that James B wore as he left in the red El Camino

4    were the same or consistent with the clothes worn by the individual riding

5    the motorcycle but he could not specifically identify the clothes at the time

6    of his testimony.  R.T. 1416-17.

7    •    The CI testified about his drug purchase from Troy Barron on March 20,

8    1996. The CI, wearing a transmitting device, went to the Loucretta

9    residence, where he found Troy and Ernest Barron in the garage. R.T.

10   1134-35; 1186-87. Troy Barron asked the CI what he wanted, and the CI

11   responded "two, meaning two ounces."  R.T. 1135. Troy Barron went

12   inside, came back out, borrowed the CI's car, drove away, and returned 15

13   minutes later. Id. When he returned, he provided the cocaine to the CI. Id.

14   •    On March 26, 1996, CRIP task force member Randy Yamada,

15   directed the CI to page James B and law enforcement recorded James B's

16   voice from his pager's voicemail. R.T. 128-29.  At trial, the CI identified

17   the voice on the recording as James B's voice. R.T. 1143. That tape

18   recording was admitted into evidence as Government's Exhibit 58. R.T.

19   129, 1142-43, 1426. James B did not call the CI back in response to his

20   page. R.T. 1143. The CI also paged Troy Barron, who called the CI back.

21   R.T. 1143-44.

22   •    On April 4, 1996, the CI bought about six ounces of base cocaine in a

23   transaction that was taped; a portion of the tape was later enhanced. R.T.

24   •    120-24.[22] Yamada met with the CI before the transaction, searched him,

25   _____

26   [22] Respondent incorrectly asserts that, within this portion of the transcript, RT 120-124, that Yamada testifies that the CI met with both James and Troy Barron on April 4, 1996, from

1    outfitted him with a transmitter, and supplied him with buy money. R.T.

2    121. After the transaction, Yamada met with the CI again and retrieved

3    from him the drugs purchased, and he also retrieved the tape recording,

4    which was admitted as Government's Exhibit 6. R.T. 123-24, 1425.

5    The enhanced portion of the tape was admitted as Government Exhibit 7.

6    R.T. 125, 1425.  Later, DEA Special Agent Christopher DeFreece had the

7    entire tape enhanced, and that tape was admitted as Government Exhibit 8.

8    R.T.  1008-9, 1425. Exhibit 7 was played for the jury. R.T. 1153. The

9    CI identified James Barron's and Troy Barron's voices on the tape.

10   R.T. 1153-54. The CI testified that Ernest Barron was not present

11   on April 4. R.T. 1274.  The CI testified, apparently confusing the date, that

12   on April 6 [rather than April 4], he went to the house; James B was there;

13   the CI said he wanted six ounces; James B spoke to Troy who was also

14   there; James B told Troy that he had sold nine ounces earlier but to go

15   ahead and get two ounces and he, James B would get the rest; this

16   conversation was recorded and played back for the jury.  R.T. 1151-53.

17   Both James B and Troy then left, returning in 20 minutes, whereupon

18   James B gave the CI all six ounces combining four ounces he had brought

19   with two he got from Troy, according to the CI.  R.T. 1154.  Stuart Jow, a

20   Sacramento County Probation Officer, also assigned to the CRIP team,

21   participated, on April 4, 1996, in the surveillance of the CI's purchase of

22   crack cocaine from James and Troy Barron at Loucretta . R.T. 486-90.

23   Before the surveillance, Jow had been supplied with photographs of both

24   James and Troy Barron. R.T. 490-91. Jow saw James and Troy Barron at

25   _____

26   whom the CI purchased crack cocaine, but that information is not contained therein.

34

the residence before the CI arrived. R.T. 489. After the CI had been at the
Loucretta residence for five or ten minutes, Jow testified that he had
initially identified Troy B to the surveillance team as the primary (the
primary being, instead, James B) when Troy had exited the house and left
in a gold vehicle, but when the second person came out, he correctly
identified that individual as James B leaving in a green and tan Bronco.
R.T. 490-92.  The mistake, he averred on cross, was that he had misstated
that Troy was the primary, not that he confused Troy with James.  R.T.
511-12.  Both James and Troy Barron returned in their respective vehicles
at about the same time, got out, and went up to the residence; he
recognized them both as the same people who drove away moments
earlier. R.T. 493. Three or four minutes later, Jow saw the CI leave the
residence, walk to his vehicle, and drive away. Id.  The April 4 transaction
was also observed by Sacramento County Deputy Sheriff Mark Kennison,
another member of the CRIP team, from an airplane. R.T. 452-58.
Kennison identified Troy Barron and James Barron when they returned to
Loucretta and got out of their vehicles. R.T. 456-57. Kennison was using
gyro-stabilized binoculars. R.T. 457.

- On April 9, 1996, James B engaged in an apparent transaction with an
individual named Leo Tillis;[23] the CI was not involved. James B was
observed on the ground by Jow (R.T. 493-98) and Kennison (R.T. 441,
459-60) and in the air by Martin (R.T. 271-76)  Jow identified James B as
the person involved in the transaction with Tillis, with Tillis emerging
from the Bronco James B had been driving, carrying a "beige plastic

___

[23] Respondent refers to Tillis as a "known crack cocaine dealer" but does not point to the place in the transcript where that is set forth.

grocery-type bag." R.T. 496-98, 500.   Kennison identified James B at the Loucretta address. RT 459-60.  Jow had been watching James B meeting with people in front of the Loucretta residence for several hours. RT 494.

- On cross-examination of Jow, James B's attorney questioned him about his familiarity with James and Troy's brother Ernest, who was deceased at the time of trial. RT 509-11.  Mr. Daar showed Jow a photograph, Defendant's Exhibit E, which was admitted into evidence. RT 1429. Jow knew Ernest Barron. RT  510. Jow was not able to say whether Exhibit E was a picture of Ernest or James Barron but believed it was possible that he could distinguish James from Ernest at 200 feet away. RT 510-11.

- Kennison identified James Barron and Troy Barron in court.  RT 461. On cross-examination, Kennison testified he was familiar with Ernest Barron. RT 474-75. He knew that Ernest Barron was one of the brothers, but he didn't "recall ever discussing him during team meetings or anything as being much of a player, as one of our primaries, Troy and James being the primary suspects." RT 475. Kennison saw Ernest Barron at Loucretta on March 20, 1996, but did not recall ever having been shown a photograph of him. RT 475.

- The CI identified James and Troy Barron in court. RT 1155-57.   The CI had known James and Troy Barron since the mid 1980s, about 10 years, and therefore had no trouble recognizing their voices on the tapes.  RT 1285-86.  The CI identified James Barron to police as someone he could buy drugs from.  RT 1175-76; 1232.  He obtained James Barron's pager number when he ran into him on the street.  RT 1182-83. He had known Troy Barron for awhile before paging him and talking to him on March 27. RT 1224.  Troy Barron told the CI to meet him at the house, the CI asked

36

where, and he said "you know where".  RT 1224.  When Troy Barron

arrived at Loucretta on March 27, he was driving a Chevy Caprice that the

CI had seen him in a few days before on 33rd Street by the big park in Oak

Park, between 26th and 5th (or 6th and 5th).  RT 1225-26.  The CI saw

James B drive by the CI's grandmother's house on 33rd at 7th and stop at

a stop sign; the CI asked for James B's pager number so he could "get at"

him for drugs, and James B gave his pager number to the CI.  RT 1226,

1230-31.   The CI engaged in idle conversation with Troy in the big park

in Oak Park in January of 1996.  RT 1231.  The CI talked to James B in

the parking lot of Oak Park Market on 12th Avenue at 33rd Street in late

January 1996 about needing to "get at him," "meaning" that he "needed to

get some drugs from him" and James B told him "just give me a holler."

RT 1127, 1233-36.  The CI went to the Loucretta residence sometime

before the February 8 buy to see if James B was there because he wasn't

responding to the CI's page.  RT 1237.  The CI knew that the Loucretta

residence was James B's mother's home, which the CI learned three or

four months before the February 8 buy.  RT 1238.  When the CI saw Troy

Barron in the big park, he was driving a grey Delta 88; he used to see

James B driving a gold Cadillac and a lot of other cars.  RT 1239.  On

February 8, the CI recognized some of the Loucretta neighbors as

members of the Crips gang.  RT 1244-45.   It was also evident the CI knew

Ernest Barron and could distinguish his appearance and voice from James

B's. See, e.g., RT 1134-35 (Troy and Ernest Barron were in the garage at

Loucretta when the CI arrived on March 20); RT 1186-87 (same, and

indicating James was not there on this occasion); RT 1258, 1260 (Ernest

was present on February 8, March 7, and March 20; Ernest's nickname

37

1    was Pony; the CI had known Ernest for awhile, knew him pretty well,

2    and would recognize a picture of him); RT 1258-59 (the CI never

3    purchased drugs from Ernest); RT 1290 (knew Ernest Barron, knew he

4    died around March of 1997, at a club partly owned by the CI's

5    grandmother).

6    •    DEA Special Agent Tom Gorman identified Government's Exhibit 79 as

7    containing an invoice and two photographs, seized from the master

8    bedroom on Gibbs Way on April 18th.  RT 859. One of the photographs

9    was of three people, one of whom Gorman identified as James Barron,

10   whom he arrested the same day. RT 859-60.  When DEA Special Agent

11   Tom Gorman arrested James B on April 18, 1996, he was wearing two

12   pagers, which Gorman seized and which were admitted in evidence as

13   Government Exhibits 36 and 37. RT 859-60.

14   •    Defendant's Exhibit R was identified by a defense witness as a

15   photograph of James and Dee Dee Barron and Exhibit E as a photograph

16   of Ernest Barron. RT 1401-2.

17   •    Probation Officer Yamada testified that he knew Ernest Barron,

18   having met him in 1986 or 1987, and last saw him in January of 1997,

19   about two months before his death. RT 1316-17, 1321. Yamada knew

20   him from his contact with the criminal justice system. RT 1318-

21   19. Yamada reviewed the photograph from Government's Exhibit 79 of

22   three people whom he recognized and identified as Ernest Barron, Troy

23   Barron, and James Barron. RT 1317.   Ernest Barron was depicted on the

24   far left of the photograph and was the only one in the photo wearing a

25   hat. RT 1318. Yamada described the differences in the three

26   men's appearances, based upon his personal knowledge:

38

"Ernest is real broad. He probably weighs about 250 pounds. He's probably about five-ten and a half. He's shorter than James, much shorter than James, maybe a little bit taller than Troy. He's a little bit darker skinned than James and Ernest [sic: Troy]. Has like kind of -- has like slanted eyes kind of." RT 1318. Yamada did not see Ernest during the period February to April of 1996; Yamada did no direct surveillance on the Loucretta residence. RT 1321-22. Ernest was driving a red and white Bronco which was at Loucretta occasionally; Yamada only saw it there a couple of times between February and April of 1996. RT 1322. Ernest was not living at Loucretta. Id. Yamada does not recall whether he showed the CI a photo of Ernest. RT 1322-23.

- During cross-examination of the CI by Troy Barron's counsel, Mr. Clymo impeached the CI by demonstrating that he was on probation for possessing rock cocaine, when he was stopped by his probation officer in possession of rock cocaine (which he then swallowed), a week before being arrested for possession for sale of rock cocaine on the charge that led to his cooperation contract. RT 1275-83.

- James B was twice convicted of possession of cocaine for sale, and once convicted of possession of cocaine. Government's Exhibit F, Information Charging Prior Convictions pursuant to 21 U.S.C. § 851; Criminal History-Exh. 2 to 6/13/01 govt. rsp. to second amended petition.

- The defense case consisted of recalling John Rogers, who was James B's father-in-law (RT 1393-96); calling James Jacoby Lee Brown, the defendant's nephew by marriage (RT 1396-1408); and recalling Sgt. Martin (RT 1409-17). Thereafter, defendants James and

39

1    Troy Barron rested. RT 1417. James B remained silent, neither

2    asserting his right to testify nor questioning why he was not called

3    to the witness stand.

4  •    In closing argument, the prosecutor pointed out that the defense attorneys

5    asked Jow to identify whether Ernest or James Barron was in a particular

6    photograph, when he was the person with the least experience with

7    the way the three brothers looked, but the defense attorneys did not

8    pursue that line of inquiry with Officers Martin and Kennison, who

9    had greater familiarity with the Barron brothers. RT 1552-53.

10    The prosecutor also reminded the jury that she recalled Yamada to

11    identify the three Barron brothers in the [Exhibit 79- RT 1317] photograph

12    to describe the differences in their appearances. RT 1553.

13  •    Mr. Daar asked the jury to compare the voices on the tape

14    recordings of the April 4 transaction with that of James B's

15    voicemail, which he asserted was James B's voice saying something to the

16    effect of "This is James' voice mail, leave a message." RT 1603.   Mr.

17    Daar argued that jurors should consider whether they could be certain

18    beyond a reasonable doubt that the speaker on the April 4 tape was James

19    B "because he is not."   He encouraged jurors to listen to the two tapes in

20    the jury room.  RT 1603.

21  •    Mr. Clymo reminded the jury of Mr. Daar's invitation. RT 1643-1644.

22    Mr. Clymo then emphasized that there was no way to do even this

23    regarding Troy Barron, and that no witness other than the CI identified

24    Troy Barron's voice. Id.

25  •    In rebuttal, the prosecutor repeated Mr. Daar's invitation to listen to the

26    voices and compare the voicemail message with the tape of the April 4

40

1    transaction. RT 1697.  She argued that Troy Barron has a very distinctive

2    voice, and the same voice is on all the tapes.  RT 1697-98.  With respect to

3    James B, she said "Go ahead, listen to his voice mail and listen to the

4    voice.  It's him.  Same guy the officers saw.  Same guy on the tapes."  She

5    also said, "There was evidence that these voices belong to James and Troy

6    Barron. There was no evidence that they did not."  RT 1698.  James B

7    made no attempt to assert his right to testify then or during or after jury

8    instructions or during a conference after the jury retired to deliberate or at

9    any point.  RT 1699-1729.

10         Respondent argues that in convicting James B of all counts (RT 1759), the jury

11   rejected his argument that the CI and law enforcement witnesses could not differentiate his

12   appearance from that of Ernest Barron, and also rejected the contention that his voice on his

13   pager's voice mail message was different from the voice the CI identified as his on the tape

14   recording of the April 4 transaction.  RPHB, pp. 15-16.

15         The court finds, as previously noted, that movant's argument that there is at least a

16   reasonable probability that the court would have limited impeachment to the fact that James was

17   convicted of prior felonies, excluding the nature of the offenses and even their number, under

18   Rule 403, is at best speculative.  If the nature of the priors had been admitted, movant's argument

19   that the jury would presumably have followed the model instruction to consider the priors only as

20   to James' credibility and not as evidence of his guilt, per Ninth Cir. Model Crim. Instr. No. 4.6,[24]

21   does not meet movant's burden because evidence of the priors alone is sufficient to undermine

22   movant's credibility without jurors impermissibly leaping to find him guilty on the basis that he

23   had committed similar prior offenses.  Even before introduction of the prior convictions, the jury

24   _____

25        [24] "You have heard evidence that defendant has previously been convicted of a crime.
     You may consider that evidence only as it may affect the defendant's believability as a witness.
     You may not consider a prior conviction as evidence of guilt of the crime for which defendant is
26   now on trial."

1   may well have been skeptical of the "dead guy did it" defense, and hence James B's credibility.

2            Mr. Daar's conclusion that movant's testimony would do him far more harm than

3   good is not sufficiently countered by movant's arguments that James B's testimony would not

4   have been cumulative (about the race on the night of the rehearsal dinner), that he would have

5   been able to provide detailed testimony about what went on behind closed doors at the Loucretta

6   residence and garage on April 4 and other pertinent dates, that he would have expressly denied

7   being the motorcycle rider and explained his brother, Ernest's, actions, that he would have

8   identified his deceased brother Ernest's voice as the one uttering incriminating statements on the

9   April 4 body wire tape.  While it is probably largely true that the jury wants to hear from the

10  defendant, and a defendant's failure to testify can leave a gaping hole in the defense case, movant

11  has not met his burden to demonstrate that this is such a case.  The government's point that

12  movant's testimony providing the jurors with more evidence of the sound of his voice may well

13  not have worked in movant's favor is arguably well-taken.  Movant's contention that trial

14  counsel Daar's arguments were not enough to persuade the jury, or at least a juror,  without

15  James B to testify and provide his voice for the jury to hear, and his account of what happened

16  and that sacrificing the defendant's testimony just to keep out the priors was not the only

17  reasonable decision in the case, does not sufficiently counter the express implication that it was

18  nevertheless a reasonable decision.  In any event, this court finds that movant has not met his

19  burden to show prejudice.

20  Conflict of Interest

21           The Sixth Amendment right to effective assistance of trial counsel includes a

22  defendant's right to representation free from a conflict of interest.  United States v. Wells, 394

23  F.3d 725, 733 (9th Cir. 2005), citing Strickland, supra, at 688, 104 S. Ct. 2052.

24           "In order to establish a violation of the Sixth Amendment [based
         on a conflict of interest], a defendant who raised no objection at
25       trial must demonstrate that an actual conflict of interest adversely
         affected his lawyer's performance."  Cuyler v. Sullivan, 446 U.S.
26       335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).   If this standard

42

1   is met, prejudice is presumed. <u>Mickens v. Taylor</u>, 535 U.S. 162,
2   166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); <u>United States v.
Rodrigues</u>, 347 F.3d 818, 823 (9th Cir.2003).

3
4   <u>Wells</u>, <u>supra</u>, at 733.

5           This court has found that movant, who raised no objection at trial when his

6   counsel did not call him to testify on his own behalf, has not demonstrated that his counsel's

7   performance was adversely affected by movant's not having testified.  Therefore, the claim that

8   movant was deprived of conflict-free counsel at trial should be denied.

9           Accordingly, IT IS RECOMMENDED that the § 2255 motion be denied as to

10  Claims I and II.

11          These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

13  days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within ten days after service of the objections.  The parties are advised

17  that failure to file objections within the specified time may waive the right to appeal the District

18  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

19  DATED: 11/14/06

20                                          /s/ Gregory G. Hollows

                                          _____
21  GGH:009                                   GREGORY G. HOLLOWS
    barr0190.fr2                               UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26

                                          43